1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT

11

EASTERN DISTRICT OF CALIFORNIA

12
13

DANIEL PENA,                                    )     1:09-cv-01494 MJS HC
                                                )
14
                         Petitioner,            )     ORDER DENYING PETITION FOR WRIT
                                                )     OF HABEAS CORPUS AND DECLINING
15
            v.                                  )     TO ISSUE CERTIFICATE OF
                                                )     APPEALABILITY
16
                                                )
17
RANDY GROUNDS, Warden,                          )
                                                )
18
                         Respondent.            )
                                                )
19

20          Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

21   pursuant to 28 U.S.C. § 2254. Respondent, Randy Grounds, as warden of Correctional

22   Training Facility, is hereby substituted as the proper named respondent pursuant to Rule 25(d)

23   of the Federal Rules of Civil Procedure. Respondent is represented in this action by Amanda

24   D. Cary, Esq., of the Office of the Attorney General for the State of California. The parties

25   have consented to Magistrate Judge jurisdiction under 28 U.S.C. § 636(c). (ECF Nos. 5, 14.)

26   I.     **FACTUAL AND PROCEDURAL BACKGROUND**

27          On August 17, 2006, a jury found Petitioner guilty of second degree murder. (Pet. at 1,

28   ECF No. 1.) The facts of the case are derived from the unpublished opinion of the California

Court of Appeal:[1]

PROCEDURAL SUMMARY

On April 3, 2006, the Kern County District Attorney charged defendant (Daniel) and codefendants Rowland Pena (Rowland) and Jessie Meza with murder (Pen. Code, § 187, subd. (a); [N.1] count 1) and residential burglary (§ 460, subd. (a); count 2). Daniel was tried jointly with Rowland. [N.2] Count 2 was dismissed in the interest of justice, but the jury found Daniel guilty of second degree murder on count 1. The court sentenced Daniel to 15 years to life in prison.

[N.1] All statutory references are to the Penal Code unless otherwise noted.

[N.2] Jessie Meza negotiated a plea.

FACTS

On the evening of December 27, 2005, Daniel and his cohort were beat up in a fight. They immediately went to get Daniel's brother, Rowland, and returned to the neighborhood for retribution. Apparently believing Mario Maya, Jr. had been involved in the earlier fight, they went to his house. Mario's uncle, Alejandro, and Alejandro's stepson were in the front yard. Both Daniel and Rowland were carrying stick-and-knife weapons. Daniel waved the weapon, then he and Rowland used the weapons to break Mario's window and fight Mario and Alejandro through the window. Mario came into the front yard and fought with Daniel. During the struggle, Daniel stabbed Mario repeatedly. As that struggle occurred, Mario's younger brother, Jesse, approached the scene with a kitchen knife. Rowland stopped him when he came up to Jesse and threatened him with the stick-and-knife weapon. But just as Rowland prepared to swing the weapon, Jesse stabbed him with the kitchen knife. As others approached, Jesse ran away. Mario's aunt, Elizabeth, was hitting Daniel with a mop and broom, trying to remove him from Mario. Rowland approached her and told her Mario had "jumped" his brother. When she told Rowland that Mario had not jumped anyone, he looked shocked. He pulled Daniel off Mario and they ran to their vehicle and sped away. The entire incident at the Maya residence lasted only a few minutes. Mario died at the hospital that evening from stab wounds. He was 20 years old.

People v. Pena, 2008 Cal.App.Unpub. LEXIS 2196 at *1-*3 (2008).

Petitioner was sentenced to an indeterminate term of fifteen years to life in state prison. (Pet. at 1.)

Petitioner directly appealed his sentence to the California Court of Appeal, Fifth Appellate District. The court affirmed the lower court's judgment on March 14, 2008. (Pet., Ex. A.) Petitioner then petitioned the California Supreme Court for review. Review was denied on

---

[1]The Fifth District Court of Appeal's summary of the facts in its March 14, 2008 opinion is presumed correct. 28 U.S.C. §§ 2254(e)(1).

June 18, 2008. (Lodged Docs. 4-5.) On August 18, 2009, Petitioner filed the instant writ of habeas petition. (Pet.) Respondent filed an answer on August 20, 2010. (Answer, ECF No. 18.) Petitioner filed a traverse on February 23, 2011. (Traverse, ECF No. 33.)

## II.     PETITIONER'S CLAIMS

Petitioner presents three claims for relief.  First, Petitioner claims the trial court erroneously denied his motion challenging the prosecutor's use of peremptory challenges under People v. Wheeler, 22 Cal.3d 258 (1978) and Batson v. Kentucky, 476 U.S. 79 (1986). for lack of a prima facie case of discrimination. Second, Petitioner claims the trial court's instruction to the jury on notetaking and readback of testimony improperly discouraged the jury from requesting readback of testimony. Finally, Petitioner asserts that California Criminal Jury Instructions, specifically, CALCRIM Nos. 220 and 222, violated his constitutional due process rights by preventing the jury from considering the lack of evidence to support a finding of reasonable doubt. The Court shall address Petitioner's claims in turn.

## III.    DISCUSSION

### A.     Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 fn.7 (2000).  Petitioner's claims involve those guaranteed by the U.S. Constitution and arise from the Kings County Superior Court of California, which is located within the jurisdiction of this court.  28 U.S.C. § 2241(d); 2254(a). Accordingly, the Court has jurisdiction over the action.

### B.     Legal Standard of Review

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  Lindh v. Murphy, 521 U.S. 320, 326 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997). The instant petition was filed after the enactment of the AEDPA; thus, it is governed by its provisions.

Under AEDPA, an application for a writ of habeas corpus by a person in custody under a judgment of a state court may be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a); Williams v. Taylor, 529 U.S. at 375 n. 7 (2000). Federal habeas corpus relief is available for any claim decided on the merits in state court proceedings if the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

### 1.    Contrary to or an Unreasonable Application of Federal Law

A state court decision is "contrary to" federal law if it "applies a rule that contradicts governing law set forth in [Supreme Court] cases" or "confronts a set of facts that are materially indistinguishable from" a Supreme Court case, yet reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005) (citing Williams, 529 U.S. at 405 06).  "AEDPA does not require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied. . . . The statue recognizes . . . that even a general standard may be applied in an unreasonable manner." Panetti v. Quarterman, 551 U.S. 930, 953 (2007) (citations and quotation marks omitted).  The "clearly established Federal law" requirement "does not demand more than a 'principle' or 'general standard.'" Musladin v. Lamarque, 555 F.3d 830, 839 (2009).  For a state decision to be an unreasonable application of clearly established federal law under § 2254(d)(1), the Supreme Court's prior decisions must provide a governing legal principle (or principles) to the issue before the state court. Lockyer v. Andrade, 538 U.S. 63, 70 71 (2003).  A state court decision will involve an "unreasonable application of "federal law only if it is "objectively unreasonable." Id. at 75-76 (quoting Williams, 529 U.S. at 409 10); Woodford v. Visciotti, 537 U.S. 19, 24 25 (2002). In Harrington v. Richter, the Court further stresses that "an unreasonable application of federal law is different from an incorrect application of federal law." 131 S. Ct. 770, 785 (2011) (citing

1    Williams, 529 U.S. at 410) (emphasis in original).  "A state court's determination that a claim

2    lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the

3    correctness of the state court's decision."  Id. at 786 (citing Yarborough v. Alvarado, 541 U.S.

4    653, 664 (2004)). Further, "[t]he more general the rule, the more leeway courts have in reading

5    outcomes in case by case determinations." Id.; Renico v. Lett, 130 S. Ct. 1855, 1864 (2010).

6    "It is not an unreasonable application of clearly established Federal law for a state court to

7    decline to apply a specific legal rule that has not been squarely established by this Court."

8    Knowles v. Mirzayance, 556 U.S. 111, 122, 129 S. Ct. 1411, 1419 (2009) (quoting Richter, 131

9    S. Ct. at 786).

10                              2.    Review of State Decisions

11          "Where there has been one reasoned state judgment rejecting a federal claim, later

12   unexplained orders upholding that judgment or rejecting the claim rest on the same grounds."

13   See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).  This is referred to as the "look through"

14   presumption.  Id. at 804; Plascencia v. Alameida, 467 F.3d 1190, 1198 (9th Cir. 2006).

15   Determining whether a state court's decision resulted from an unreasonable legal or factual

16   conclusion, "does not require that there be an opinion from the state court explaining the state

17   court's reasoning." Richter, 131 S. Ct. at 784 85. "Where a state court's decision is

18   unaccompanied by an explanation, the habeas petitioner's burden still must be met by

19   showing there was no reasonable basis for the state court to deny relief." Id. ("This Court now

20   holds and reconfirms that § 2254(d) does not require a state court to give reasons before its

21   decision can be deemed to have been 'adjudicated on the merits.'").

22          Richter instructs that whether the state court decision is reasoned and explained, or

23   merely a summary denial, the approach to evaluating unreasonableness under § 2254(d) is

24   the same: "Under § 2254(d), a habeas court must determine what arguments or theories

25   supported or, as here, could have supported, the state court's decision; then it must ask

26   whether it is possible fairminded jurists could disagree that those arguments or theories are

27   inconsistent with the holding in a prior decision of this Court." Id. at 786.  Thus, "even a strong

28   case for relief does not mean the state court's contrary conclusion was unreasonable." Id.

1  (citing Lockyer v. Andrade, 538 U.S. at 75).  AEDPA "preserves authority to issue the writ in

2  cases where there is no possibility fairminded jurists could disagree that the state court's

3  decision conflicts with this Court's precedents."  Id.  To put it yet another way:

> As a condition for obtaining habeas corpus relief from a federal court, a state
> prisoner must show that the state court's ruling on the claim being presented in
> federal court was so lacking in justification that there was an error well
> understood and comprehended in existing law beyond any possibility for
> fairminded disagreement.

7  Id. at 786 87.  The Court then explains the rationale for this rule, i.e., "that state courts are the

8  principal forum for asserting constitutional challenges to state convictions." Id. at 787.  It

9  follows from this consideration that § 2254(d) "complements the exhaustion requirement and

10  the doctrine of procedural bar to ensure that state proceedings are the central process, not

11  just a preliminary step for later federal habeas proceedings."  Id. (citing Wainwright v. Sykes,

12  433 U.S. 72, 90 (1977)).

13                     3.     Prejudicial Impact of Constitutional Error

14         The prejudicial impact of any constitutional error is assessed by asking whether the

15  error had "a substantial and injurious effect or influence in determining the jury's verdict."

16  Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 121-22

17  (2007) (holding that the Brecht standard applies whether or not the state court recognized the

18  error and reviewed it for harmlessness).  Some constitutional errors, however, do not require

19  that the petitioner demonstrate prejudice.  See Arizona v. Fulminante, 499 U.S. 279, 310

20  (1991); United States v. Cronic, 466 U.S. 648, 659 (1984).  Furthermore, where a habeas

21  petition governed by AEDPA alleges ineffective assistance of counsel under Strickland v.

22  Washington, 466 U.S. 668 (1984), the Strickland prejudice standard is applied and courts do

23  not engage in a separate analysis applying the Brecht standard.  Avila v. Galaza, 297 F.3d

24  911, 918, n. 7 (2002).  Musalin v. Lamarque, 555 F.3d at 834.

25  **IV.    REVIEW OF PETITION**

26         **A.    Claim One: Discriminatory Peremptory Challenges of Jurors**

27         Petitioner claims the trial court erroneously denied his Wheeler/Batson motion for lack

28  of a prima facie case of discrimination as to the prosecution's peremptory challenges of three

1   Hispanic jurors. Specifically, Petitioner focuses on a specific juror, "Ms. M," who based on her

2   friendship and family connection to law enforcement and judicial officers, was a favorable

3   witness to the prosecution, but nonetheless was excused. (Pet. at 5.)

4           1.      Relevant State Court Decision

5           On Petitioner's direct appeal, the Fifth District Court of Appeal denied Petitioner's claim

6   in a reasoned decision. The California Supreme Court summarily denied Petitioner's petition

7   for review. Based on the "look-though" doctrine of Ylst v. Nunnemaker, the Fifth District Court

8   of Appeal decision is considered to be adapted by the California Supreme Court and the

9   operative state court decision for this claim. 501 U.S. at 803. In the decision the state court

10  found that there was no inference of discrimination on the part of the prosecutor in exusing the

11  jurors and denied the claim:

12          [Petitioner] contends the trial court erred by not finding a prima facie case
        of discrimination in the prosecutor's use of peremptory challenges against
13      Hispanic prospective jurors. When defense counsel raised the motion below, he
        claimed the prosecutor had excused three Hispanic prospective jurors. On
14      appeal, [Petitioner] has apparently limited his argument to the excusal of a
        single Hispanic prospective juror, Ms. M., who he argues would have been an
15      acceptable and favorable juror for the prosecution. We agree with the trial court
        that [Petitioner] failed to raise an inference of discrimination.

16

17          The use of peremptory challenges to excuse prospective jurors based on
        race violates the federal and state Constitutions. (Batson v. Kentucky (1986) 476
18      U.S. 79, 97; People v. Wheeler (1978) 22 Cal.3d 258, 276-277.) "Such a use of
        peremptories by the prosecution 'violates the right of a criminal defendant to trial
19      by a jury drawn from a representative cross-section of the community under
        article I, section 16 of the California Constitution. [Citations.] Such a practice
20      also violates the defendant's right to equal protection under the Fourteenth
        Amendment to the United States Constitution.' [Citation.]" (People v. Bonilla
21      (2007) 41 Cal.4th 313, 341.) There is a rebuttable presumption that a
        peremptory challenge is being exercised properly, and the opposing party bears
22      the burden to demonstrate impermissible discrimination. (Purkett v. Elem (1995)
        514 U.S. 765, 768; People v. Bonilla, supra, at p. 341.)

23          The defendant must first "make out a prima facie case 'by showing that
        the totality of the relevant facts gives rise to an inference of discriminatory
24      purpose.' [Citation.] Second, once the defendant has made out a prima facie
        case, the 'burden shifts to the State to explain adequately the racial exclusion'
25      by offering permissible race-neutral justifications for the strikes. [Citations.]
        Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide
26      … whether the opponent of the strike has proved purposeful … discrimination.'
        [Citation.]" (Johnson v. California (2005) 545 U.S. 162, 168, fn. omitted.) [N.3]
27      Moreover, "[Johnson] explain[ed] that 'a defendant satisfies the requirements of
        Batson's first step by producing evidence sufficient to permit the trial judge to
28      draw an inference that discrimination has occurred.' [Citation.] The defendant

having shown membership in a cognizable class, and keeping in mind '"that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate,'"' the defendant '"must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race."' [Citation.]" (People v. Cornwell (2005) 37 Cal.4th 50, 67.)

[N.3] In Johnson v. California, supra, 545 U.S. 162, the United States Supreme Court reversed People v. Johnson (2003) 30 Cal.4th 1302, and concluded that California courts had been applying too rigorous a standard in deciding whether defendants had made out a prima facie case of discrimination. (See Johnson v. California, supra, 545 U.S. at pp. 166-168 [holding the requirement that a defendant show a "strong likelihood," rather than a "reasonable inference," of discrimination was inconsistent with Batson and the federal Constitution].)

"The three-step Batson analysis, however, is not so mechanistic that the trial court must proceed through each discrete step in ritual fashion. Thus, the trial court may invite the prosecutor to state race-neutral reasons for the challenged strikes before announcing its finding on whether a defendant met the first step of the Batson test by making out a prima facie case of discrimination." (People v. Adanandus (2007) 157 Cal.App.4th 496, 500-501.) Indeed, "it is the better practice for the trial court to have the prosecution put on the record its race-neutral explanation for any contested peremptory challenge, even when the trial court may ultimately conclude no prima facie case has been made out. This may assist the trial court in evaluating the challenge and will certainly assist reviewing courts in fairly assessing whether any constitutional violation has been established." (People v. Bonilla, supra, 41 Cal.4th at p. 343, fn. 13; see also People v. Mayfield (1997) 14 Cal.4th 668, 723-724 [even where no prima facie case found, court may properly consider reasons actually given by the prosecutor].)

"[W]here the '"trial court denies a Wheeler motion without finding a prima facie case of group bias the reviewing court considers the entire record of voir dire. [Citations.] As with other findings of fact, we examine the record for evidence to support the trial court's ruling. Because Wheeler motions call upon trial judges' personal observations, we view their rulings with "considerable deference" on appeal. [Citations.] If the record "suggests grounds upon which the prosecutor might reasonably have challenged" the jurors in question, we affirm.'"' [Citation.]" (People v. Adanandus, supra, 157 Cal.App.4th at p. 501, citing People v. Crittenden (1994) 9 Cal.4th 83, 116-117; People v. Bonilla, supra, 41 Cal.4th at p. 341 ["we review the trial court's denial of a Wheeler/Batson motion deferentially, considering only whether substantial evidence supports its conclusions"].)

In this case, when defense counsel made a Wheeler/Batson motion during jury selection, the following occurred:

"[DEFENSE COUNSEL]: Thank you, Your Honor. I'll make a motion for Batson Wheeler for a mistrial.

"The People have in the jury selection process -- from eight challenges, from my direct notes, excused three of what I believed

to be Hispanic jurors, Mr. [B.], Mr. [G.] and the last one was [Ms. M.]

"Based on what was related to us by these prospective jurors, at least the last one, I would say that there wasn't anything that would disqualify her other than her ethnic background. I think there is an inference that the People are selectively excluding Hispanic jurors, and I'll submit it with those remarks.

"THE COURT: Ms. [Prosecutor]?

"[THE PROSECUTOR]: Your Honor, I don't -- first of all, I don't think Mr. [G.] was Hispanic.

"THE COURT: I don't think Mr. [G.] was Hispanic either. You certainly didn't question ethnic background. I'm not going to consider Mr. [G.] Hispanic. There is no indication to the Court he's Hispanic.

"[DEFENSE COUNSEL]: I'll submit it.

"[THE PROSECUTOR]: Further, I don't think [defense counsel] has met his burden for the Court to justify why I excused the other two possible Hispanic jurors.

"THE COURT: I would concur. The motion is denied. Bring the jury back in, please."

On appeal, [Petitioner] correctly concedes the prosecutor's excusal of Mr. B., a young man who reported having many unwarranted contacts with police due to his long hair, did not raise an inference of discrimination. He also implicitly concedes the excusal of Mr. G. did not raise an inference of discrimination. Instead, Daniel focuses on the peremptory challenge of Ms. M., arguing that her excusal alone was enough to raise an inference of discrimination. We conclude the record as a whole fails to support a reasonable inference that the prosecutor's peremptory challenges reflected the discriminatory purpose of eliminating Hispanics from the jury.

In making this assessment, we must evaluate the totality of the relevant circumstances surrounding the use of the peremptory challenge against Ms. M. (See Johnson v. California, supra, 545 U.S. at p. 168.) First, the circumstance that the prosecutor challenged Ms. M., one prospective juror who was Hispanic, did not in itself support an inference of bias. (People v. Cornwell, supra, 37 Cal.4th at pp. 69-70 ["circumstance that the prosecutor challenged one out of two African-American prospective jurors does not support an inference of bias"]; People v. Bonilla, supra, 41 Cal.4th at pp. 342-343 [exclusion of a single prospective juror may be the product of improper group bias, but, practically, exclusion of one or two jurors rarely suggests a pattern of impermissible exclusion].) [N.4] Second, the circumstance that Ms. M. seemed to possess characteristics making her favorable to the prosecution also did not necessarily raise an inference of bias. (See People v. Turner (1994) 8 Cal.4th 137, 165 [prosecutor may act on a hunch or apparently arbitrarily, as long as the peremptory challenge is not based on group bias], disapproved on another point in People v. Griffin (2004) 33 Cal.4th 536, 555, fn. 5]; People v. Cornwell, supra, 37 Cal.4th at p. 69 [circumstance that juror was not subject to exclusion for

cause certainly did not support inference that the exercise of a peremptory challenge against her was motivated by group bias].)

[N.4] In <u>Bonilla</u>, the court stated: "It is true the prosecution used peremptories to challenge both African-Americans in the pool, but the small absolute size of this sample makes drawing an inference of discrimination from this fact alone impossible. '[E]ven the exclusion of a single prospective juror may be the product of an improper group bias. As a practical matter, however, the challenge of one or two jurors can rarely suggest a pattern of impermissible exclusion.'" [Citations.]" (<u>People v. Bonilla</u>, supra, 41 Cal.4th at pp. 342-343, fn. omitted.) "'[T]he ultimate issue to be addressed on a <u>Wheeler-Batson</u> motion "is not whether there is a pattern of systematic exclusion; rather, the issue is whether a particular prospective juror has been challenged because of group bias." [Citation.] But in drawing an inference of discrimination from the fact one party has excused "most or all" members of acognizable group' -- as Bonilla asks the court to do here – 'a court finding a prima facie case is necessarily relying on an apparent pattern in the party's challenges.' [Citation.] Such a pattern will be difficult to discern when the number of challenges is extremely small." (<u>Id.</u> at p. 343, fn. 12.)

We note that the record in this case fails to reflect the number of prospective Hispanic jurors remaining on the panel, or whether any of the jurors ultimately selected were Hispanic.

Finally, any possibility that Ms. M.'s excusal was motivated by race was eliminated by her own statements regarding her hardship and reluctance to serve. Ms. M. was taking courses to gain admission to nursing school. Later, when the prospective jurors were asked if any of them felt they could not serve on the jury due to a reason beyond an inconvenience or minor hardship, Ms. M. raised her hand and explained that she had a midterm exam the following Thursday morning, a second midterm the same night, then a state medical assistant certification exam the next morning at 7:30 a.m. She said she would fail both classes and have to pay $ 155 to take the state exam if she missed the exams. The court stated it would arrange for her to make her 7:30 a.m. state exam on Friday, then encouraged her to speak to her instructors about rescheduling her midterms.

In our opinion, despite Ms. M.'s other favorable traits as a prospective juror, any competent prosecutor would have considered excusing Ms. M. for this race-neutral reason. [N.5] If Ms. M. could not reschedule her midterm exams, she would have been understandably distracted, even angered, by the loss of her investment of time and money in the courses, which she had been forced to fail, and by the prospect of having to retake them. And even if she succeeded in rescheduling the exams, she likely would have been distracted by her inability to study and prepare for them. Any reasonable prosecutor would want to avoid a distracted and possibly resentful juror. (See <u>People v. Garceau</u> (1993) 6 Cal.4th 140, 172 [reluctance to serve due to hardship], overruled on another point in <u>People v. Yeoman</u> (2003) 31 Cal.4th 93, 117-118.)

[N.5] We recognize that Ms. M. generally wanted to serve as a juror, but her discussion of this hardship clearly established that she was reluctant to do so for these reasons.

We find nothing in the record to support an inference that the prosecutor discriminated against Ms. M. because of her race. In addition to the paucity of defense counsel's reasons for a prima facie case, our independent review of the voir dire also reveals no inference of discrimination on the part of the prosecutor.

1   Pena, 2008 Cal.App.Unpub. LEXIS 2196 at *3-*13.

2              2.      Analysis

3       Evaluation of allegedly discriminatory peremptory challenges to potential jurors in

4   federal and state trials is governed by the standard established by the United States Supreme

5   Court in Batson v. Kentucky, 476 U.S. 79, 89 (1986).

6       In Batson, the United States Supreme Court set out a three-step process in the trial

7   court to determine whether a peremptory challenge is race-based in violation of the Equal

8   Protection Clause. Purkett v. Elem, 514 U.S. 765, 767 (1995). First, the defendant must make

9   a prima facie showing that the prosecutor has exercised a peremptory challenge on the basis

10  of race. Id. That is, the defendant must demonstrate that the facts and circumstances of the

11  case "raise an inference" that the prosecution has excluded venire members from the petit jury

12  on account of their race. Id. If a defendant makes this showing, the burden then shifts to the

13  prosecution to provide a race-neutral explanation for its challenge. Id. At this second step, "the

14  issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is

15  inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." Id.,

16  quoting Hernandez v. New York, 500 U.S. 352, 360 (1991). Finally, the third step requires the

17  trial court to determine if the defendant has proven purposeful discrimination. And "[s]ince the

18  trial judge's findings in the context under consideration here largely turn on evaluation of

19  credibility, a reviewing court ordinarily should give those findings great deference." Batson, 476

20  U.S. at 98, n.21.

21      In this case, the state court's determination that under Batson there was no racial

22  pretext in the prosecution's exercise of a peremptory strike to Prospective Juror Ms. M., a

23  Hispanic female was not unreasonable. Petitioner challenges the prosecution's peremptory

24  strike as to one Hispanic juror.[2] At trial, the court denied the objection stating that Petitioner

25  did not meet his burden to show that the peremptory strike created an inference of

26  discrimination without reasoning. Pena, 2008 Cal.App.Unpub. LEXIS 2196 at *3-*13. On

27  _____

28      [2] While the objection at trial was to three jurors, on appeal, Petitioner only challenges the peremptory
    strike as to one juror.

1    appeal, the state court found that in viewing the totality of the relevant circumstances, that

2    there was not an inference of bias, as the juror in question had personal obligations,

3    specifically, school and credentialing exams that would have made it difficult to serve, and it

4    would cost the juror money if she missed the exams. Id. In light of the juror's obligations, the

5    state court found that despite the juror's favorable traits to the prosecution, there was no

6    inference of bias based on her obligations to take exams during trial. Id.

7         At the first step of the Batson analysis, Petitioner must make out a prima facie case

8    "by showing that the totality of the relevant facts gives rise to an inference of discriminatory

9    purpose." Johnson v. California, 545 U.S. 162, 168 (2005) (footnote omitted). In order to

10   establish a prima facie case of racial discrimination, a petitioner must show that "(1) the

11   prospective juror is a member of a "cognizable racial group," (2) the prosecutor used a

12   peremptory strike to remove the juror, and (3) the totality of the circumstances raises an

13   inference that the strike was motived by race." Boyd v. Newland, 467 F.3d 1139, 1143 (9th Cir.

14   2006) (citing Batson, 476 U.S. at 96, and Cooperwood v. Cambra, 245 F.3d 1042, 1045-46

15   (9th Cir. 2001)). A prima facie case of discrimination "can be made out by offering a wide

16   variety of evidence, so long as the sum of the proffered facts gives 'rise to an inference of

17   discriminatory purpose.'" Johnson v. California, 545 U.S. at 169 (quoting Batson, 476 U.S. at

18   94.)[3] In evaluating whether a petitioner has established a prima facie case, a reviewing court

19   should consider the "'totality of the relevant facts' and 'all relevant circumstances' surrounding

20   the peremptory strike." Boyd, 467 F.3d 1146 (quoting Batson, 476 U.S. at 94, 96). The

21   Petitioner's burden at the first Batson step is "not an onerous burden." Crittenden v. Ayers,

22   624 F.3d 943, 955 (9th Cir. 2010). As the Supreme Court clarified in Johnson v. California, 545

23   U.S. at 170:

24            We did not intend the first step to be so onerous that a defendant would
              have to persuade the judge — on the basis of all the facts, some of which are
25            impossible for the defendant to know with certainty — that the challenge was

26   _____

27        [3] In Batson, defense counsel timely objected to the prosecutor's use of peremptory challenges because
     they resulted in striking "all black persons on the venire." Id., 476 U.S. at 100. The Supreme Court held that this
28   was a sufficient basis to find an inference of racial discrimination and that the trial court erred when it "flatly
     rejected the objection without requiring the prosecutor to give an explanation for his action." Id.

more likely than not the product of purposeful discrimination. Instead, a defendant satisfies the requirements of <u>Batson</u>'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred.

In this case, Petitioner objected to the peremptory strike as racially motivated based, in part, on Ms. M's membership in a cognizable racial group. A peremptory strike of an prospective juror of a cognizable racial group does not, by itself, support an inference that discrimination occurred, <u>see</u> <u>United States v. Vasquez-Lopez</u>, 22 F.3d 900, 902 (9th Cir. 1994), but it is afforded weight in combination with the other factors offered by defense counsel.

Here, Petitioner has provided little information upon which to determine if there was a prima facie inference of discrimination. <u>Cullen v. Pinholster</u>, 131 S.Ct. 1388, 1399 (2011) (In assessing under section 2254(d)(1) whether the state court's legal conclusion was contrary to or an unreasonable application of federal law, "review... is limited to the record that was before the state court that adjudicated the claim on the merits."). The only information before the court was the fact that the prosecution struck eight jurors, and the statements made by the juror in question. "[C]omparative juror analysis may be employed at step one to determine whether the petitioner has established a prima facie case of discrimination." <u>Crittenden</u>, 624 F.3d at 956. However, none was provided here. As the challenge is only to one juror, without a sufficient record, it is difficult to determine if a prima facie case of discrimination occurred. It is noted that striking a single juror can be sufficient to show an inference of discrimination:

> We have held that the Constitution forbids striking even a single prospective juror for a discriminatory purpose. But just as "one" is not a magic number which establishes the absence of discrimination, the fact that the juror was the one Black member of the venire does not, in itself, raise an inference of discrimination. Using peremptory challenges to strike Blacks does not end the inquiry; it is not per se unconstitutional, without more, to strike one or more Blacks from the jury. A district court must consider the relevant circumstances surrounding a peremptory challenge.

<u>United States v. Vasquez-Lopez</u>, 22 F.3d 900, 902 (9th Cir. 1994) (citations omitted). However, the purported reasons for dismissing the juror, namely her hardship based on upcoming professional and certification exams, does not infer discriminatory intent.

On direct review, the trial court's determination regarding the prosecutor's proffered

1     reasons is entitled to "great deference," <u>Batson</u>, 476 U.S., at 98, n. 21, and "must be sustained

2     unless it is clearly erroneous." <u>Snyder v. Louisiana</u>, 552 U.S. 472, 477 (2008). On federal

3     habeas review, "AEDPA 'imposes a highly deferential standard for evaluating state-court

4     rulings" and "demands that state-court decisions be given the benefit of the doubt.'" <u>Felkner</u>

5     <u>v. Jackson</u>, 131 S. Ct. 1305, 1307 (2011), quoting, <u>Renico v. Lett</u>, 130 S.Ct. 1855, 1862

6     (2010). In this case, the state appellate court decision, in light of the relative dearth of

7     evidence, was not unreasonable. The determination that Petitioner did not make a prima facie

8     showing of an inference of discrimination was not erroneous.

9         Petitioner fails to demonstrate that the state court rejection of his claim "resulted in a

10    decision that was contrary to, or involved an unreasonable application of, clearly established

11    Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d).

12    The claim should be denied.

13         **B.**    **Claim Two: Jury Notetaking and Readback**

14         Petitioner next claims that the trial court's instruction to the jury on notetaking and

15    readback of testimony improperly discouraged the jury from requesting readback of testimony.

16         1.    <u>State Court Opinion</u>

17         The last reasoned state court decision is from the California Court of Appeal, Fifth

18    Appellate District Court's decision confirming Petitioner's conviction. The court explained:

19
20            [Petitioner] contends the trial court engaged in improper jury coercion by discouraging the jurors from exercising their right under section 1138 to have testimony read back to them. FN 6. We reject this contention.

21
22
23
24            FN 6. Section 1138 provides: "After the jury have retired for deliberation, if there be any disagreement between them as to the testimony, or if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called."

25
26            Prior to opening statements and the presentation of evidence, the court instructed the jury regarding notetaking and readback of testimony, in relevant part, as follows:

27
28               "All of you have been given notepads and pencils. I'll tell you a little bit about the use of those. You may take notes during

this trial. You'll be able to use notes during your deliberations and take them back to the jury room for use in your deliberations. [P] A word of caution; you may take notes; however, you should not permit note taking to distract you from the ongoing proceedings. Remember, you are the judges of the believability of the witnesses. Further, notes are only an aid to memory and should not take precedence over independent recollection. And the juror who does not take notes should rely upon his or her independent recollection of the evidence and not be influenced by the fact that other jurors do take notes.

"Notes are for the note-taker's own personal use in refreshing his or her recollection of the evidence. That means you put on that pad whatever helps refresh your recollection -- if it's words, numbers, or pictures – because you're the only one that can consult with it at the end of the trial. If you get back in the jury room, you find somebody wasn't paying attention, you can't pull out your pad and say, 'I have it written right here,' because your pads are not official record. The official record is the reporter's transcript.

"If somebody wasn't paying attention during the trial, you have to ask for a readback. It takes us 45 minutes to set up the courtroom for readback. And the reason it takes so long is that while you're back there deliberating, I will be starting a new trial. After that we'll have new parties in here and … I will be using the same reporter. And it's not going to be this reporter because this reporter is about to leave us, and I'm going to [be] getting another reporter Monday. We'll have a new reporter starting Monday.

"I will be using that reporter then straight through on the next trial also. So if you need readback, we have to stop that proceeding, clear the courtroom of those people, those jurors. We've got to bring these parties back, bring you back in the courtroom, and she has to look it up in her notes, find out where it was -- where it was you need the readback, and the reporter will take the witness stand and read it back to you.

"Now, the reason I mention that to you is we don't like to have to do readback because it's kind of disruptive. But the only way that we can be assured of not doing that is that you pay very close attention during the trial. I can tell you the trial is going to go one or two or three days, and this one undoubtedly is going to do that.

"There are boring parts to this trial. It's not like a TV program. They give you only the interesting stuff. So it gets boring, and sometimes you lose a little bit of concentration. I always like to tell jurors when you find yourself drifting off a little bit, start taking notes. It will kind of wake you up, get you back into the thing again. Because sure enough, when we relax a little bit, something will come in that somebody will think important and you'll get back in the jury room and say, 'Gee, I don't remember that.' So I'll just give you that to help you out a little bit. It will speed up your deliberations also if you don't have to ask for

readback."

At the conclusion of the trial, the court instructed the jury with CALCRIM No. 202, as follows:

> "You have been given notebooks and may have taken notes during the trial. Please do not remove your notes from the jury room. You may use your notes during deliberations but only to remind yourself of what happened during the trial. Remember, your notes may be inaccurate or incomplete. If there is a disagreement about what actually happened at the trial, you may ask the court reporter to read back the relevant parts of the testimony to assist you. It is the testimony that must guide your deliberations and not your notes."

The jury did not request any readbacks of testimony during its deliberations.

> "Pursuant to section 1138, the jury has a right to rehear testimony and instructions on request during its deliberations. [Citations.] Although the primary concern of section 1138 is the *jury's* right to be apprised of the evidence, a violation of the statutory mandate implicates a defendant's right to a fair trial conducted '"substantially [in] accord[ance with] law."' [Citations.]" (People v. Frye (1998) 18 Cal.4th 894, 1007.)

> Here, the court accurately informed the jury that readbacks of testimony involve delay and can disrupt other court proceedings; it never indicated that requests for readbacks would not be honored. (Cf. People v. Hillhouse (2002) 27 Cal.4th 469, 506 [merely informing the jury of the time it may take for rehearing testimony is not impermissible jury coercion].) A fair reading of the court's comments is that the court was recommending notetaking as one way to help individual jurors keep their attention engaged during the trial. Although the court suggested that readbacks necessitated solely by juror inattention might be avoided by notetaking, the court still made clear that if the jurors needed a readback, they would be accommodated. Moreover, at the end of trial, the court clearly informed the jurors, this time without mention of delay or disruption, that they should ask for a readback and rely on the testimony rather than their notes in case of a disagreement. Daniel has not shown the court's comments here amounted to impermissible jury coercion or otherwise violated the jury's or Daniel's right to have the jury provided with readbacks of testimony on request.

Pena, 2008 Cal.App.Unpub. LEXIS 2196 at *13-*19.

> 2.    Analysis

Petitioner's claim does not merit federal habeas relief for three reasons. First, federal habeas relief is limited to addressing violations of federal law. Estelle v. McGuire, 502 U.S. 62, 67-68 (1991). As such, to the extent Petitioner's claim is based solely on the trial court's alleged misapplication of California law (Cal. Penal Code § 1138), such a claim is not cognizable on federal habeas review.

1    Second, the Court has not found any U.S. Supreme Court precedent, nor do the parties

2    cite any, that squarely addresses whether a criminal defendant has a constitutional right to

3    have testimony read back to the jury. In the absence of such Supreme Court precedent, the

4    Court cannot conclude that the state court's decision was contrary to, or involved an

5    unreasonable application of, clearly established Federal law. 28 U.S.C. § 2254(d)(1); Wright

6    v. Van Patten, 552 U.S. 120, 126 (2008) (per curiam); Moses v. Payne, 555 F.3d 742, 754 (9th

7    Cir. 2009). And in any event, the Ninth Circuit has held that "a trial court has wide latitude in

8    deciding whether to have testimony requested by the jury read back." Riley v. Deeds, 56 F.3d

9    1117, 1120 (9th Cir. 1995).

10    Third, even assuming that there had been a constitutional violation, any error was

11    harmless. See Brecht, 507 U.S. at 637-638 (habeas relief not warranted unless the error had

12    a "substantial and injurious effect or influence in determining the jury's verdict."). As the state

13    court described, the trial court later told the jury that it would accommodate notetaking and

14    readback. Furthermore, while the trial court explained why it discouraged readback, it did not

15    state that it would be done if requested, instead, the court explained its thoughts on readback

16    to encourage the jury to pay close attention to the testimony provided at trial.

17    Petitioner fails to demonstrate that the state court rejection of his claim "resulted in a

18    decision that was contrary to, or involved an unreasonable application of, clearly established

19    Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d).

20    The claim should be denied.

21    **C.    Claim Three: Instructional Error**

22    Petitioner contends the instructions defining reasonable doubt and the burden of proof,

23    CALCRIM Nos. 220 and 222, deprived him of federal due process of law by preventing the jury

24    from considering lack of evidence.

25    Petitioner raised this claim on direct appeal and the California Court of Appeal denied

26    the claim in the last reasoned decision stating:

27        [Petitioner] argues CALCRIM No. 220, the reasonable doubt instruction,
       and CALCRIM No. 222 violated his due process rights because they prevented
28       the jurors from considering the *lack of evidence*, rather than the evidence

received at trial, in determining whether reasonable doubt existed as to his guilt. [N.7]

> [N.7] The jury was instructed with CALCRIM No. 220, as follows: "The fact that a criminal charge has been filed against the defendant is not evidence that the charge is true. You must not be biased against the defendants just because they have been arrested, charged with the crime, or brought to trial. The defendant in the criminal case is presumed to be innocent. This presumption requires that the People prove each element of the crime and special allegation beyond a reasonable doubt.
>
> "Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt, unless I specifically tell you otherwise. Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt.
>
> "In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider *all the evidence that was received throughout the entire trial.* Unless the evidence proves the defendant[s'] guilt beyond a reasonable doubt, they are entitled to an acquittal, and you must find them not guilty." (Italics added.)
>
> The jury was then instructed with CALCRIM No. 222, which provided in part: "You must use only the evidence that was presented in the courtroom, the evidence of sworn testimony of witnesses, exhibits admitted into evidence, and anything else I told you to consider as evidence."

In determining the correctness of jury instructions, we consider the instructions as a whole. (People v. Carrasco (2006) 137 Cal.App.4th 1050, 1061.) An instruction can be found to be ambiguous or misleading only if, in the context of the entire charge, there is a reasonable likelihood the jury misconstrued or misapplied its words. (People v. Frye, supra, 18 Cal.4th at p. 957.)

Reasonable doubt may arise from the lack of evidence at trial as well as from the evidence presented. (People v. Simpson (1954) 43 Cal.2d 553, 566.) The plain language of CALCRIM No. 220 does not instruct otherwise. The only reasonable understanding of the language, "[u]nless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty," is that a lack of evidence could lead to reasonable doubt. Contrary to [Petitioner]'s claim, CALCRIM No. 220 did not tell the jury reasonable doubt must arise from the evidence. The jury was likely "to understand by this instruction the almost self-evident principle that the determination of defendant's culpability beyond a reasonable doubt … must be based on a review of the evidence presented." (People v. Hawkins (1995) 10 Cal.4th 920, 963, abrogated on another ground in People v. Lasko (2000) 23 Cal.4th 101, 110; see also People v. Rios (2007) 151 Cal.App.4th 1154, 1157.)

[Petitioner] relies on Simpson and on People v. McCullough (1979) 100 Cal.App.3d 169, which cites Simpson. These cases are inapposite. In Simpson,

1
2
3
4
5
6

the defendant argued that the trial court's instruction on reasonable doubt had shifted the burden to him to prove his innocence. The trial court instructed: "'The term "reasonable doubt," as used in these instructions, means a doubt which has some good reason for its existence arising out of evidence in the case; such doubt as you are able to find a reason for in the evidence.'" (People v. Simpson, supra, 43 Cal.2d at p. 565, fns. omitted.) The court held this language was "not necessary" and "could have been confusing" because "reasonable doubt … may well grow out of the lack of evidence in the case as well as the evidence adduced." (Id. at p. 566.) Similarly, in McCullough, the court determined a supplemental instruction stating the doubt must arise from the evidence to be erroneous. (People v. McCullough, supra, at p. 182.)

7
8
9

Here, unlike in Simpson or McCullough, the instructions did not tell the jury the reasonable doubt had to arise out of the evidence in the case. They merely said the jury was to consider all of the evidence presented. We see no error.

Pena, 2008 Cal.App.Unpub. LEXIS 2196 at *19-*22.

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

A challenge to a jury instruction solely as an error under state law does not state a claim cognizable in a federal habeas corpus action. See Estelle v. McGuire, 502 U.S. 62, 71-72 (1991). To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. See id. at 72. Additionally, the instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. Id. The court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process. See United States v. Frady, 456 U.S. 152, 169, (1982) (citing Henderson v. Kibbe, 431 U.S. 145, 154 (1977)). Furthermore, even if it is determined that the instruction violated the petitioner's right to due process, a petitioner can only obtain relief if the unconstitutional instruction had a substantial influence on the conviction and thereby resulted in actual prejudice under Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (whether the error had a substantial and injurious effect or influence in determining the jury's verdict.). See Hanna v. Riveland, 87 F.3d 1034, 1039 (9th Cir. 1996). The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal." Id.

28

Petitioner has failed to demonstrate the state courts' determination of this issue was not

1 | contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

2 | The jury was instructed with CALCRIM 220 which states:

> The fact that a criminal charge has been filed against the defendant is not evidence that the charge is true. You must not be biased against the defendant just because they have been arrested, charged with a crime, or brought to trial.

> A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt unless I specifically tell you otherwise.

> Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt.

> In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. Unless the evidence proves the defendant guilty beyond a reasonable doubt, they are entitled to an acquittal and you must find them not guilty.

(CT 127.)

Pursuant to CALCRIM 222 the jury was instructed:

> You must decide what the facts are in the case. You must use only the evidence that was presented in this courtroom. "Evidence" is the sworn testimony of witnesses, the exhibits admitted into evidence, and anything else I told you to consider as evidence.

> Nothing that the attorneys say is evidence. In their opening statements and closing arguments, the attorneys discuss the case, but their remarks are not evidence. Their questions are not evidence. Only the witnesses' answers are evidence. The attorneys' questions are significant only if they helped you to understand the witnesses' answers. Do not assume that something is true just because one of the attorneys asked a question that suggested it was true.

> During the trial, the attorneys may have objected to questions or moved to strike answers given by the witnesses. I ruled on the objections according to the law. If I sustained an objection, you must ignore the question. If the witness was not permitted to answer, do not guess what the answer might have been or why I ruled as I did. If I ordered testimony stricken from the record you must disregard it and must not consider that testimony for any purpose.

> You must disregard anything you saw or heard when the court was not in session, even if it was done or said by one of the parties or witnesses.

> The court reporter has made a record of everything that was said during the trial. If you decide that it is necessary, you may ask that the court reporter's notes be read to you. You must accept the court's reporter's notes as accurate.

> During the trial, you were told that the People and the defense agreed, or

stipulated, to certain facts. This means that they both accept those facts. Because there is no dispute about those facts you must accept them as true.

(CT 128-29.)

Here, Petitioner has failed to demonstrate the Court of Appeals determination that the instructions defining reasonable doubt was either an unreasonable application of federal law or an unreasonable determination of the facts. The jury was specifically instructed pursuant to CALCRIM No. 220 that "[u]nless the evidence proves the defendant is guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty." The jury was instructed that evidence consisted of any sworn testimony of witnesses and exhibits that were admitted into evidence. CALCRIM NO. 222. The plain language of these instructions properly conveyed to the jury that if the evidence presented was insufficient to prove an element of a crime beyond a reasonable doubt, such lack of evidence would require an acquittal. Thus, there is no reasonable likelihood CALCRIM Nos. 220 and 222 improperly prevented the jury from considering the lack of evidence in rendering its decision of reasonable doubt. Thus, Petitioner's claim is without merit and he is not entitled to federal habeas relief.

## ORDER

Accordingly, IT IS HEREBY ORDERED:

1) Petitioner's petition for writ of habeas corpus is DENIED;

2) The Clerk of Court is DIRECTED to enter judgment and close the case; and

3) The Court DECLINES to issue a certificate of appealability. 28 U.S.C. § 2253(c); Slack v. McDaniel, 529 U.S. 473, 484 (2000) (in order to obtain a COA, petitioner must show: (1) that jurists of reason would find it debatable whether the petition stated a valid claim of a denial of a constitutional right; and (2) that jurists of reason would find it debatable whether the district court was correct in its procedural ruling. Slack, 529 U.S. at 484. In the present case, the Court finds that reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal habeas corpus relief debatable, wrong, or deserving of encouragement to proceed further. Petitioner has not made the required substantial showing of the denial of a constitutional right. Accordingly, the Court hereby DECLINES to

1    issue a certificate of appealability.

2

3

4

5    IT IS SO ORDERED.

6    Dated:    August 21, 2012                    /s/ *Michael J. Seng*
                                         UNITED STATES MAGISTRATE JUDGE
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28